The next case on our docket is 20-10523. I think it's Lifshen v. 2020 Accounting Solutions, LLC. Mr. Baruch? Yes, Your Honor. Can you hear me okay? Yes. Thank you. Are you ready for me to proceed, Your Honor? I'm sorry. Oh, very well. May it please the Ms. Lifshen's negligent undertaking claim really hinges on just three questions. First, did she raise a fact issue on reliance? Or alternatively, can she rely on the risk of harm prong? Second, is a physical injury to property necessary for a negligent undertaking claim in Texas? And third, can the judgment be sustained based on proportionate responsibility? I'm going to address each of those questions in turn this afternoon. But before I do that, I'd like to make a very fast 10 or 15 second observation. At first glance, at sort of eyewash level, this does seem to be the perfect case for negligent undertaking theory. 20-20 admits that it voluntarily was paying these insurance premiums. And it admits telling Dr. Lifshen that it would pay the bill. And then telling Dr. Lifshen that it had paid the bill. And it didn't pay the bill. As a result, an elderly widow failed to collect $1 million. So at a sort of bird's level view, or bird's eye view, if you will, this would seem to be the perfect case. And yet here we are. Let me ask you about the history of paying these bills. Was 20-20 reimbursed by the doctors if they paid the premiums in the past? I don't believe the record reflects an answer to that question, Your Honor. I mean, it would be hard to believe that weren't the case. But in candor, I don't think the record contains that information. And I think it's important to note also that the record is not terribly specific as to how many times 20-20 had paid the bill. But there is evidence in the record that it had a history of doing so. Diane Lifshen tendered an affidavit that said 20-20 had a custom and history of having paid that bill for Dr. Lifshen. And did they pay it for the other doctors in the group? Again, I don't believe the record contains any information on that, Your Honor. I'm going to start with the issue on reliance. Because I think all of the focus really, both in the briefing and in the district court opinion, was on colonial savings and the increased risk of harm element. But I think it's a much easier case on the reliance prong. Remember, those are alternatives. You can either show reliance or show an increased risk of harm. And what's interesting about reliance is that colonial savings is also a reliance case. In that case, again, all the attention in the briefing was that the Supreme Court of Texas said no increased risk of harm. The house burned down from fire. Not buying insurance didn't cause the fire, therefore. But at the end of the decision, the Supreme Court actually reverses the JNOV and remands the case because it says there is a fact issue as to reliance. And I want to talk about that for about two minutes because it found that fact issue on nearly identical facts. Colonial savings, really oddly in the context of this case, even though it involved a burned down house, is very similar because it involved one lot that had two houses on it. And the insurance company sent a letter to the new property owner saying, hey, we've bound coverage on what it called the property and enclosed the policy. The policyholder just, he, the owner said, I didn't even look at it. I just threw it in a drawer. They told me they bound. Well, it turned out the mortgage holder had not realized that there were two houses. So they had bound insurance on one house and not the other. And of course, as luck would have it, it's the other one that burned down. And the Supreme Court looked at that and said, well, we don't think that anything the mortgage company did in gratuitously agreeing to go buy insurance caused the fire. But we do think that letter to the homeowner saying we've bound coverage raises a fact issue on reliance that's going to have to go back for a jury trial. Now, here we have actually much stronger evidence of reliance. We don't just have the email. We certainly have that, the email saying, hey, we're going to pay it. And the email the following day saying, hey, we did pay it. We also have Diane Lifshin testifying that this was historically true. They had always paid it from the beginning of the contract. So how then did the district court reject the evidence of reliance? Well, the district court actually didn't reach that issue. The district court decided reliance based on briefing waiver, essentially. What the district court said was that although they argued, Lifshin argued reliance in her response, she did not point the district court to any evidence in the record proving reliance. And Judge Starr, who I've known for a long time and have the greatest respect for, used a line that he uses often, which is the line about federal judges not being pigs hunting for truffles in the summary judgment record. And he said, because you didn't point me to it, essentially you've waived the issue. And I think generally, of course, we all know that rule and we all agree with it. I don't think any of us expect a trial judge to sift through a thousand pages of a summary judgment record ferreting out evidence for a non-movement. But here, it's not so apt in this way. This was a 42 page record. My client tendered 20 some pages of the contract and about 10 pages of emails, and that was all the evidence. Did the pleadings point to the emails? Yes, your honor. And that was the point I was about to make, was that in the statement of facts, if you look at volume one of the pleadings record at pages 371 and 372, you will see Ms. Lifshin's lawyer clearly pointing to those emails and detailing them for the trial court. So it's true that in the argument section, when they came back to reliance, they didn't drop another footnote, and they should have. That would have been the best practice always. But they had identified those emails for the trial court. So I don't think this- If you're right that the district court clearly aired saying there's no evidence of reliance, don't you still have to show that Texas law for negligent undertaking extends to non-physical harm? And that, I guess, is your other- You'd still have to show that. And I'll just show my cards right up front. When I look at Judge Atlas's opinion in Coachman, and I look at Torrington, it seems like that's an open question. So the district court, in my opinion, wasn't correct saying it's not actionable, but we don't know if it is or isn't. Yet neither party has suggested we certify, unless I'm wrong. What do you think of that package of statements? I think everything you've just said is correct, Your Honor. And as Your Honor knows, I was not involved in the briefing. I think this- If the court concludes that's the dispositive question, I think this is a great candidate for certification, and I'll explain why. I mean, as I understand, and I know very little about the process of how the court goes about making an eerie guess, but there's got to be something to go on. And here, there seems to me to be almost nothing to go on. The intermediate courts clearly are divided. And I want to make sure I point out, Your Honor, that we- I assume the court has seen it, but I do want to note, I filed a supplemental authorities letter last week in which I detailed five or six of the intermediate decisions in Texas going the other way, holding that a physical injury is not required. So I agree completely. I think that question is completely open under Texas law, and none of the intermediate court decisions really provide any analysis. Some states that look at the restatement do limit it to physical harm. It's very possible Texas would, but the point that seems to me that Judge Alice has explored is that we just don't know. I agree with that, Your Honor. And I would also say, and I'm going to- Perhaps I could give you a couple of other citations that the parties did not address. That is correct. Many states limit it to physical injury, but not all. Some do not. And so I found two cases that I thought were very interesting. One is from New York. The other is from Georgia. If you haven't cited these in the briefs, I'm not speaking for my colleagues, but even the 28-J letter, I would just move on with the arguments from my standpoint that you made in the brief. Fair enough. Fair enough, the Texas authorities with respect to term life insurance policies, if they have no accrued value, is that an asset? Well, I think that's a fair question. I'm sorry, Your Honor. Talking about harm and damages and, you know. Well, I think it is. I mean, but that's an open question as well. I can't point you to any authority, Your Honor, and I don't want to suggest otherwise that would answer that question. But it seems to me, for example, we all would agree that it is an asset that would have to be divided in a divorce, for example, whether it has cash value or not. And I think that, as I understand it anyway, from my limited work in the divorce context, a policy like that still has value. It just requires someone who knows a great deal more than I do about valuation to place a value on it. But I don't think the absence of an actual cash value necessarily means the asset has no value. But I think, you know, one of the things that occurs to me about this open question and an eerie guess is that the physical injury requirement seems to make sense in the context of an injury to person. I mean, I think in the law, we draw distinctions frequently between physical injury and purely mental or emotional injury. And sometimes we limit claims, tort claims on that very basis. We say we're not going to let you go down that path unless there's a physical injury. So nothing surprising there. I'm not sure that I think it makes the same amount of sense in the context of property. In other words, if I can recover for a house that is worth $2 million, for the loss of a house that's worth $2 million, why can I not recover for the loss of the $2 million? That line is just in the context of the restatement. And as we've discussed, many states do require physical injury to property. But it seems to me that that line in the restatement is more logically directed at the personal injury part than the property injury part. I would have the same question, for example. I think if we said injury to property, you know, why could you there? But I want to be clear. I think all of this is just wide open under Texas law. We're writing on almost essentially a blank slate in terms of Texas law on the physical injury requirement. Why do you think the district court was confident to say it required physical injury? What was it looking at? I think it was looking at the restatement. And, you know, the restatement says that, of course, as the district court pointed out, the Texas Supreme Court has cited the restatement but has never explicitly adopted it or addressed this question. Let me, with my few minutes left, I think it's pretty important that I talk about proportionate responsibility because obviously that would be, you know, the court could conclude anything it wanted, including the need for certification and proportionate responsibility might supersede all that. I think this 51% finding is kind of hard to wrap my head around in light of the course of the dealing here and the procedural background. And I want to be sure the court knows the procedural background. 2020 asserted 29 affirmative defenses in its answer and did not seek summary judgment on proportionate responsibility. It made what it called a public policy argument, but neither its motion, its brief, nor its reply even contained the words proportionate responsibility. This was the district court identifying proportionate responsibility and then making the finding on it. And my client had no notice of that until issuance of the opinion, had no real need even, no notice of the need to even address that argument. Setting that aside, I think just on the facts of the case, it's a puzzling conclusion because the whole argument goes back to the fact that 2020 told Dr. Lifshin the check cleared on August 3rd. We paid it, it cleared on August 3rd. The letter Dr. Lifshin received was dated August 5th. So 2020's argument was clearly reliance could not have been reasonable. But I would just make two know that there is sometimes a processing lag between the time our check clears and the time it is applied to whatever account we're talking about. So I don't think a 48 hour or less delay necessarily should have triggered any alarm bells with Dr. Lifshin. But more important is 2020 is the expert on this. Dr. Lifshin is the client, 2020 is the bill paying practice management expert. And when they're telling him, it's just very hard to understand why the client in this situation would be at a 51 percent and the entity responsible to pay and with all of the expertise in these types of matters would be at 49 percent. That's, I think, a very difficult conclusion to justify. At a minimum, it seems to us to be a classic fact issue and the trial court probably should have allowed that one to proceed to trial to hear the testimony of 2020 as to the history of payment on this bill. Are you aware of any Texas case that has ever decided allocation of responsibility at the summary judgment level? Federal case, your honor, or state case? Texas. Any state case ever resolving allocation responsibility. I am not. Under our state law in Texas, that unquestionably would go to the jury. The district court cited, I believe, this court's authority talking about that rare situation where all the facts are in and et cetera, et cetera. And I think that was the district court's thought process on why it could resolve what otherwise we all, I think, would agree is a classic fact issue. I'm out of time, so with no more questions, I'll thank you. Okay. Mr. Hale. Yes. Thank you. I want to start by just clarifying what I think is a mistake in the factual summary about the way some of these emails and notifications occurred. I heard Mr. Barrick say that there was an email where we admitted that we would pay this particular invoice, the invoice for policy ending in 1750, and an email confirming that we did pay it. In fact, neither of those are exactly right. The very first time that my client got a message about these personal life insurance policies was August 1st. And that message only contained some type of document that referenced another insurance policy that ended with 1442. That was on August 1st. The next email that my client gets is dated August 23rd of 2016. And this is the email that has an attachment, apparently, that has one page dealing with the 1442 policy and another page dealing with the 1750 policy. And the 1750 policy is the one that didn't get paid. So on August 23rd, Dr. Lifshin sends these documents, these two pages, as an attachment to an email, and the body of the email reads, please pay ASAP, thanks. Jesse Sandhendrich, an employee of 2020, responds within hours saying, we paid on check 51316, and I should have cleared the bank on August 3rd. There's no reference that which policy she's talking about. She didn't know from Dr. Lifshin's email that there were even two. And that's the source of the confusion in this case is that nobody ever highlighted or pointed out that there are two insurance policy premiums that Dr. Lifshin was asking to be paid. What about in prior years? Had 2020 paid the premiums on those policies? Your Honor, there's no evidence in the record of that. I just don't know. So the first mention of any of them that's come up in this case has been this August 1 email that pertains to the 1442 policy. So you're saying out of the blue, he just asked the company to pay it with no history, with no prior discussion? That's the best explanation I can give, Your Honor. That's all that's available. And so... Did they pay other personal bills of this particular position or any of the other positions? No, Your Honor, they didn't. Well, I say that, let me qualify when I talk to my client about it. It was never their practice to pay anybody's personal expenses. If there was one that just didn't stick out, if it looked like it could conceivably be a practice expense for anything that a podiatry practice might spend money on, they didn't dig that deep, I guess, into all invoices that looked like they could be practice expenses. I guess I hear what you're saying and it is clarifying, but in terms of looking at the reasoning of the district court, are you not defending the district court's larger legal conclusion that there couldn't be an actionable case without physical harm? Or were you going to get to that? In other words, when I look at what the district court actually held here, it made that sweeping conclusion about Texas law and then independently, it seemed to assume you'd voluntarily undertaken the duty, but it concluded there wasn't evidence of reliance and opposing counsel says, well, we pled the emails, look at the emails. So what's your, are you defending the district court's reasoning? I am. I believe the district court had it right. There was no evidence of any kind of reliance on anything that 2020 said. The email and response that we paid with this check and on this date and it cleared, that wasn't any type of affirmative course of action that led to, uh, an increased risk of harm. And I think the district court was correct, but there's, so there's no material dispute of fact as to whether 2020 was paying these personal life insurances. You think it's just conclusive proof that they weren't? Well, they paid one and there's no doubt about that, but that's all the, that's all the evidence that there is. Um, the, and I think the timing of these emails is because, uh, Mr. Barrett was just talking about how, uh, the letter was dated August the 5th. Um, that was the notice of a late payment. Um, that notice that Dr. Lifshin received at his home address addressed to him from the life insurance carrier. Um, it wasn't a 48 hour turnaround about the check being cleared the bank on August 3rd. And he has the letter on August 5th. He didn't send the email till August 23rd. And so in that amount of time, I think that falls right in line with the district court's, uh, view of the proportionate responsibility prong where there was ample time for him to, to, to, to look at this and wonder if, if the policy. I'm not sure about the facts here. Did, did the, did Dr. Lifshin send two checks? Like, did he send a check earlier in either late July or early August for the 14 something policy? And then send a second check? Just one email about the 1442 policy. And then the next email was August 23rd. And it had two checks apparently. My client 2020 paid one check. Uh, he said, didn't he send a check to 2020 or not? No, your honor. I don't believe so. So he's asking them to pay. All right. He didn't, he wasn't sending money to them and saying, now you I'm reimbursing you, you pay this. No, your honor. I pay for my life insurance and they did it. Exactly. Please pay ASAP and no other explanation or, or anything. And I, uh, this kind of, in my mind, anyway, dovetails into the, so we don't know from the existing record, who was paying the earlier previews. No, your honor. Okay. I hadn't really focused on that issue, but you started to talk about chapter 33. Is opposing counsel correct that you never relied or asserted chapter 33 is an affirmative defense below that the district court came up with that? That is not true, your honor. It's affirmative defense number six. It was a part of our motion for summary judgment. We, uh, it is true that it was in the, we referenced that statutory section. It was included in the public policy portion of that, um, of that argument, uh, to the extent that it's a fundamental premise of Texas common law, that individuals are responsible for their, for their own, you know, personal, um, they're personally responsible. Personal responsibility is a fundamental premise of Texas common law. Right. But it's not a question of personal responsibility. It's, it's, it's comparative or what I think of as comparative. And I was really looking into Texas law because the district court cited no cases and you, you only mentioned it in a footnote and you cite no cases. So I guess my question that would be very helpful is, do you know of a case that was decided by a court at summary judgment? No, your honor. Um, I can't point you to one, but I do think where the district court relied on the Nunez decision and said that where the, there is going to be no jury and the judge is the trier of fact, and all the evidence that is before the court is before the court, then there's no reason to, to engage in a trial because all the evidence is going to be there is already there. This is what I need to be very clear about. I mean, had you all agreed or had the parties agreed, there's not going to be a jury trial. And to the extent there are fact issues, the district court can decide them. Had that been agreed upon? Your honor, it wasn't a subjective agreement, but no party demanded a jury. Well, that's, that's not what I asked. I mean, summary judgment is summary judgment. You can't just reach out and say, okay, they're fact issues here and I'm going to go ahead and decide them as a trier of fact, you've got to give some notice that we're going to have a bench trial seems to me. Well, my understanding of what the district court was saying was that the district court is going to be the one determining and winning these issues at a bench trial. You've got to notice that there's a bench trial. Does anybody have any witnesses they want to bring? You know, you can't just say, oh, you know, since you haven't asked for a jury trial, I'm going to, it's the summary judgment stage, convert this to a bench trial. Do you have any, do you have any authority for that? That a judge can do that without notice? No, your honor, other than the case was going to be a bench trial from the very beginning. Was going to be, but it wasn't. Was going to be is not was. You're exactly right. Um, the only point I would add to that is the, the appellant didn't file any kind of 56 D affidavit or declaration or anything of that sort to say that there's other evidence that we haven't been able to obtain, or we, you know, we need this to be able to properly oppose the summary judgment. There's nothing like that. And I hesitate to put myself in the district court shoes, but I don't know what other evidence you heard a minute ago. It does sound debatable. You may prevail. He's clearly at fault. If he gets called by the insurer as to his policy and they're saying it's you're in a grace period and he hasn't quite noticed, well, they might the other 2020 saying they paid it. But if I really looked at the dates, I mean, he's clearly at fault, but how could we say there's conclusive proof? How can we say there's conclusive proof that he has 51% or more responsibility? It's just sort of a big guesswork. That's something that's triable. Well, and you're right that I think that that it would be a tribal issue. And these are questions that a jury would normally resolve, but because the jury was not ever going to hear this case, that it was gonna be a bench trial. The district court, I have to presume, felt confident on the record that was already developed in the lack of deposition testimony and in the documentary evidence. What did anybody discuss at the summary judgment stage, either in the motion or the hearing? We went on proportionate responsibility. Yes, your honor. That was one of our arguments that we... That as a matter of law, he bore at least 50, more than 50% of the responsibility as a matter of law? Yes, your honor. And in making that argument, I cited to the record evidence about the dates that we talked about, about the email from my client saying that the check had cleared on August 3rd and at the same time... Okay, so could you give us a record site if you actually explicitly argue that, that the proportionality statute you have in front of you? I do. I was under the impression that this was more the district court had come up with this as a quote independent reason. Your honor, it's a record... I'm not sure I've got the right... The right page. About... Oh, that's all right. Page 264, I found it. Page 264 is where we made the argument and then in our reply... Well, rather than eat up time here, you can supplement that in the letter to the court. Okay. When the judge ruled, he had before him the fact that your client had paid one of the premiums for the insurance. So he knew that your client had paid it, just didn't pay two. So why wasn't that pursued? That seems like a pretty significant issue to me with respect to the reliance. Well, your honor, it was an issue for the district court and something that both sides briefed, that there was no contractual, no contract based duty for my client to have to pay that invoice, either one of them for that matter, or any personal expense for any of the doctors. The district court found that we of course agree that there's no contractual duty to have that obligation. There was no general negligence common law duty to impose that obligation, just because the general premise that normally one doesn't have the obligation to do anything. Well, they had actually paid in early August, late July, they had actually paid the premium on one policy. So they had undertaken to pay with respect to that policy. That's right, your honor. And the email where the employee of 2020 says, paid with this check number and cleared the bank on August 3rd. But an argument that we advance is that there was no affirmative course of action taken with respect to the 1750 policy. But didn't she say she would call the insurance company and try to straighten it out? Didn't she offer to do that? Yes, your honor, after the fact, and I should clarify. After the policy had lapsed, we did try to help and be of some assistance where we could, but that ultimately did not work. Before your time runs out, is there any reason to disagree with opposing counsel that there really isn't clear statements by testis courts as to whether economic harm is never actionable? I'm thinking particularly of the case that was cited to Judge Coachman, I mean, the Judge Atlas opinion, Judge Coachman, that was her conclusion too. Doesn't seem to favor either view, but I don't see a case saying the restatement physical harm that Texas has embraced that. I believe that's correct, your honor. I'm not aware of any case but the district court did. So what would you recommend we do with that? Would it be at best a certification question? Well, I think the district court was just saying that there's no evidence of reliance. Well, before it got to the reliance point, it pretty clearly says that as a matter of law, Texas would require physical harm. This isn't physical harm, this is an insurance policy. It was a fairly extended discussion. Are you defending that or is that an open issue in Texas law? No, your honor. I would agree that it's an open issue in Texas law. Yeah, that's my conclusion. I guess I was just trying to, it seemed like the backstop that the district court relied on was that there was no evidence of any kind of proof of reliance. And so it didn't seem, those discussed didn't seem material or at least critical to the district court's decision. I think that decision could be affirmed for the same reason. I guess, I mean, we've sort of gone over this, but if 2020, if you're agreeing you did pay one, I mean, there's a little bit of a reliance then on these doctors. And yet the record just doesn't answer. Did you pay that out of your own funds or we just don't know? Well, there's nothing in the record that says, I don't mind sharing that when my client would pay any invoice that came out of PMPT's account, you know, whether or not Dr. Lipshin or any other doctor that was deemed to have had a personal expense paid by the business would reimburse the practice or if it was netted out of a draw or anything like that. Doesn't that make it at least a material issue as to whether these doctors relied on you? If you did it a little bit out of PMPT's account, then it's plausible that they're relying on that. Well, again, there's nothing in the record that would say that there's, you know, a history or a practice of us paying these personal invoices. And certainly it was never my client's intent to accept what could be unlimited liability in engaging into a bookkeeping arrangement where it would pay where it would pay invoices on behalf of a practice. It just could never occur to them that they would face unlimited liability if and no payment if personal invoices were missed. For business, it's a little bit easier to pay late fee or expedited payment or whatever the Is there any evidence whether this was policy was required by the partnership or the whatever agreement the positions had? I mean, that's not uncommon for key key man insurance, so to speak, to be paid for by the business enterprise. Is there record evidence of that one way or the other? Well, Your Honor, only that this policy, even according to Mrs. Lifshin's claims, was a personal policy. She was the beneficiary of it. The the notices and invoices and things for premiums were sent to their home address. It has all the hallmarks of a personal policy there. But there isn't any evidence of a, you know, a firm benefit insurance policy for any members. I don't believe I have anything else, but you'll have additional questions for me. Mr. Barrett, rebuttal. Thank you, Your Honor. I want to be clear in my answer to Justice Higginson's question. I think I answered it correctly, but I want to make certain proportionate responsibility was one of the 29 affirmative defenses pled in the answer. It was not asserted as a basis for summary judgment. I am holding in my hand page nine of 2020 motion for summary judgment, which is where counsel is arguing they asserted this, and that section of the brief does not cite the proportionate responsibility statute, does not cite any proportionate responsibility statute case, and does not contain the words proportionate responsibility. They were making a different argument. They did not make this argument, and they did not cite the proportionate responsibility statute in their reply brief. So it is, I think, beyond question that this is an argument that, or an affirmative defense, that the district court identified from the answer and then proceeded to make part of the summary judgment. With respect to the factual question, let me just correct one point. There is evidence that this bill had historically been paid by 2020, and by paid by, let me be clear, perhaps I've been losing my language here. I'm not suggesting 2020 provided the funds. I'm merely suggesting, of course, that 2020 performed the physical act of paying with the practice's money. But there is that evidence, and it's in the appendix. The last exhibit to my client's summary judgment appendix was an affidavit from Diane Lifshin, and paragraph three says, on or about August 23, Jay Lifshin sent defendant an invoice for the policy with the request that defendant process the invoice for timely payment per its usual custom and practice with Jay Lifshin. Now, that's certainly not as strong as we might like it to be. It doesn't contain all the dates of past payments, but it is evidence in the record that the payment in August 2016 absolutely was not the first time 2020 had paid on these policies. It had a custom and practice of paying this for Dr. Lifshin. That evidence is enough to at least create a fact issue. However, the jury or the judge on a bench trial might wait in the future. The same thing is true, I think, about the emails. I mean, how hard is it to look back at the last few months of checks to see, or I guess years, I guess it was an annual premium. I don't know. How hard would it be to look back and see? Can't imagine it would be difficult, Your Honor. That was not done. Apparently not. Apparently not. This statement by Diane Lifshin that this the custom and practice is all we have in the record as to pre-2016 payments. You are not the trial lawyer. No, Your Honor. Well, the summary judgment lawyer. Correct, Your Honor. So, in the emails on August 23rd, Dr. Lifshin sends the email we're all talking about, please pay ASAP. Well, I think it's important that that email didn't occur in a vacuum. There was an attachment, and the attachment was for the policy that we're talking about. Please pay. He was asking for an attached invoice on this policy, and the response comes back crystal clear from 2020. We already paid, and it cleared the bank. That's what 2020 told him, and they knew it because later when all of this kind of, when the rubber met the road on all this later on, they didn't deny it. The same woman, when Dr. Lifshin sent an email after the policy lapse saying, if you go back through your emails, you're going to see where I sent you this invoice, the same woman at 20 wrote back and said, I am so sorry for exclamation points. I did miss it, and we'll call them today to try to correct this issue. Again, I'm not suggesting that's anything as a matter of law, but it's sure enough to raise a fact issue on reliance, and even later than that, the principle of 2020 writes to a representative of Dr. Lifshin and says, he explains the whole thing. I have a bill, and then he says, you know, turns out there were two policies. He says, I'm working with my risk manager who is working with my client's insurance carrier to come up with a solution. So 2020 wasn't denying that it just made a mistake. It got the invoice from Dr. Lifshin, so I just think that's important to sort of clarify the facts. The bottom line here in our view is that on reliance and proportionate responsibility, these just clearly were fact issues that needed to be resolved at trial, whether it was a bench trial or a jury trial. With respect to physical injury, we believe probably the better course would be certification simply because there just doesn't seem to be a whole lot that would inform the decision's eerie guess, but if the court is inclined to make an eerie guess, as I've indicated, we just don't think it makes much sense to require arguments for this afternoon. The court is in recess until one o'clock tomorrow afternoon.